******************************************

The "officially released" date that appears near the be-
ginning of each opinion is the date the opinion will be pub-
lished in the Connecticut Law Journal or the date it was
released as a slip opinion. The operative date for the be-
ginning of all time periods for filing postopinion motions
and petitions for certification is the "officially released"
date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecticut
Reports and Connecticut Appellate Reports. In the event of
discrepancies between the advance release version of an
opinion and the latest version appearing in the Connecticut
Law Journal and subsequently in the Connecticut Reports
or Connecticut Appellate Reports, the latest version is to
be considered authoritative.

The syllabus and procedural history accompanying the
opinion as it appears in the Connecticut Law Journal and
bound volumes of official reports are copyrighted by the
Secretary of the State, State of Connecticut, and may not
be reproduced and distributed without the express written
permission of the Commission on Official Legal Publica-
tions, Judicial Branch, State of Connecticut.
******************************************

STATE OF CONNECTICUT *v.*
ZAIRE RAULIN LUCIANO
(AC 42263)

Bright, C. J., and Alvord and Prescott, Js.

*Syllabus*

Convicted of the crimes of assault in the second degree and conspiracy to commit assault in the first degree in connection with a fight at a bar, the defendant appealed to this court. One victim of the fight, C, suffered a head wound as a result of being punched, and the other victim, T, was struck by a bat and suffered, inter alia, a fractured ankle. Although there was evidence that the defendant exchanged punches with C, no evidence was presented that the defendant wielded the bat or as to the identity of the person who did. The defendant claimed, inter alia, that the evidence was insufficient to support his conviction. *Held*:

1. The evidence adduced at trial was insufficient to support the defendant's conviction of conspiracy to commit assault in the first degree: there was no evidence presented or any reasonable inference that could have been drawn that a relationship existed between the defendant and the unidentified person who wielded the bat or that they engaged in any coordinated action, and an inference by the jury that the defendant had entered into an agreement with that person would be based on impermissible conjecture; moreover, the brief nature of the incident supported the conclusion that, even if the defendant saw the individual with the bat while he continued to exchange punches with C for a short period of time, there could not have been an inference that his continued participation in the fight supported an inference of an agreement with the bat wielding individual, and, accordingly, a judgment of acquittal of that crime was directed.

2. There was insufficient evidence presented at trial to establish that C's injuries were caused by means of a dangerous instrument, as C did not testify and the evidence established only that the defendant had exchanged punches with C and C was later transported to a hospital, and, accordingly, a judgment of acquittal of assault in the second degree was directed.

Argued February 4—officially released May 4, 2021

*Procedural History*

Amended information charging the defendant with the crimes of assault in the first degree, assault in the second degree, and conspiracy to commit assault in the first degree, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *B. Fischer, J.*; thereafter, the court denied the defendant's motion for a judgment of acquittal; verdict and judgment of guilty of the crimes of assault in the second degree and conspiracy to commit assault in the first degree; subsequently, the court denied the defendant's motions for a new trial and to vacate the conviction, and the defendant appealed to this court. *Reversed; judgment directed.*

*Erica A. Barber*, for the appellant (defendant).

*Rocco A. Chiarenza*, assistant state's attorney, with whom, on the brief, were *Patrick J. Griffin*, state's attorney, and *Seth R. Garbarsky*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ALVORD, J. The defendant, Zaire Raulin Luciano, appeals from the judgment of conviction, rendered after a jury trial, of one count of assault in the second degree in violation of General Statutes § 53a-60 (a) (2), and one count of conspiracy to commit assault in the first degree in violation of General Statutes §§ 53a-48 (a) and 53a-59 (a) (1).[1] On appeal, the defendant claims that the evidence was insufficient to support (1) his conviction of conspiracy to commit assault in the first degree and (2) his conviction of assault in the second degree.[2] We agree with the defendant and, accordingly, reverse the judgment of the trial court.

The jury was presented with evidence of the following facts. On the evening of April 22, 2016, Jason Torello was having a few beers at home in North Branford. He had recently lost someone close to him and was "sort of a homebody." Torello's good friend, Edward Corradino, called to ask if he wanted to go out. Although Torello declined, Corradino stopped by his house and convinced him to go to Bar 80 (bar), which was approximately a mile from Torello's house. They arrived at the bar around 9 p.m. and went inside. The bar was fairly empty. They sat at a table, and Torello had four to eight beers. Torello also had taken Xanax, which was prescribed to him for anxiety, and had snorted one line of cocaine, and he described himself as intoxicated. Corradino also was drinking and using drugs.

Outside the front entrance to the bar, a large group of "Hispanic, Latino looking" men were standing around and smoking cigarettes. Corradino and Torello went outside in front of the bar to smoke cigarettes two or three times throughout the night. At around 10 p.m., Torello and Corradino were outside smoking cigarettes when Rob Burgos,[3] who knew Torello but had not seen him in a long time, reintroduced himself. The two made small talk for less than a minute before Torello went back inside the bar and Burgos walked back toward the group of men.

Sometime after midnight, Torello and Corradino went outside to smoke another cigarette. Someone from the same group of men present earlier told Torello that he could not smoke in front of the bar and that he had to go around the back of the building by the dumpster. Torello responded by saying "that sounds pretty weird" that there is a group of people smoking but he cannot smoke his cigarette. Then he said, "Anybody planning to do anything?" According to Torello, "things kind of hit the fan" at that point. Torello used his cell phone to call his father to come help him.[4] While Torello was still holding his cell phone, a stocky Hispanic man with "lighter skin" and "short hair" walked up to him. "Fists started flying," and Torello and the man exchanged blows. Torello could not make much of a fist because

he still had his cell phone in his hand.

The two had not been fighting for very long when another individual came from Torello's left and hit him in the head with a "bat, something metal." Torello did not get a good look at the bat, and testified that "it could have been a pipe, one of the extendo baton things." Torello tried to grab it but it slid out of his grasp, and the next swing hit Torello in the head. Torello lost consciousness for about thirty seconds and fell to the ground. More than one person continued to beat Torello with "bat hits, kicks, [and] punches."

Meanwhile, the defendant had squared up with Corradino, and the two exchanged punches. Out of Torello's peripheral vision, he could see the defendant "in [Corradino's] face." At some point, Corradino fell on top of Torello. Torello never saw the defendant with a bat. At some point, the group of men took off. Torello saw a few of them leaving in a black BMW, and he believed that he saw the defendant and Burgos leave together in a red Corvette.[5] Torello, however, was unsure whether Burgos was involved in the fight or whether he was present with the group of Hispanic men outside the bar just before the fight started.

Edwin Serrano, a friend of the defendant's father, who had known the defendant for seven years, testified at trial to other events leading up to the fight. According to Serrano, he arrived at the bar at the same time as the defendant. Later in the evening, Serrano was outside smoking a cigarette with the defendant when he saw three white men around twenty-five or twenty-seven years old walk into the bar. One of the men appeared intoxicated and said "something racist against [Hispanic] people." The comment was not directed at anyone in particular. About twenty minutes later, Serrano was outside with the defendant smoking another cigarette when he saw the man who he thought had made the racist comment come outside. Serrano then saw three other men, one of whom had a bat, approach from Serrano's left. Serrano was not able to describe the men because it "happened so fast." According to Serrano, the defendant put his hands up and said, "Whoa, whoa, whoa, whoa." Serrano went back into the bar and did not see the fight. The defendant stayed outside.

Kelsey Henninger was inside the bar when the fight broke out. Henninger had dated Burgos but the two were on "a break," and she did not know that he was going to be at the bar that night. Henninger knew the defendant through Burgos, and she knew Torello from middle school. At some point during the evening, Henninger saw Burgos and the defendant with a group of people that she had never seen before.

Through the bar window, Henninger saw people running outside and "a lot of chaos." She went outside and saw Torello on the ground and vehicles leaving the

parking lot. Henninger testified that she then went back inside and met Burgos as he was coming in from the back door of the bar. According to Henninger, Burgos told her that there was "a fight." Henninger never saw the defendant after the fight. Henninger testified that she and Burgos left the bar together.[6]

Officer Henry Browne of the North Branford Police Department was at a gas station 100 to 200 yards away from the scene when he was dispatched to the bar for an "active fight."[7] He responded within seconds and saw two vehicles leaving the property as he arrived.[8] A woman yelled to Officer Browne for help, and he found Corradino and Torello, both of whom were injured and appeared to be in shock but were able to answer questions. Corradino was bleeding from a wound on his head and was "pacing around." He told Officer Browne that he was hit in the head. Torello was lying on the ground and had sustained an injury to his leg. Torello and Corradino told Officer Browne that they could not identify who had assaulted them. By this time, Torello's father had arrived and was trying to render aid to him. Paramedics also arrived and began attending to Torello and Corradino. Officer Browne spoke with people at the bar.[9]

Torello was taken to Yale New Haven Hospital (hospital), where he underwent surgery for a fractured ankle.[10] He told the treating physician that he did not know whether he had been struck in the ankle or had fallen on it.

Sean Anderson, an acting lieutenant and sergeant in the detective bureau, and his colleague, Detective Robert Deko, both of the North Branford Police Department, began investigating the fight a few days after it happened. They located the red Corvette that had been seen leaving the bar,[11] obtained a search and seizure warrant, and had it towed to the police station. Detective Nieves of the New Haven Police Department processed the Corvette. Nieves seized from inside the Corvette a white polo shirt with a diagonal stripe, a pair of jeans, a Walgreen's receipt,[12] and a bank statement in the defendant's name. Both the shirt and jeans had brown stains on them, and presumptive tests revealed the presence of blood. A presumptive test on the driver's side headrest also revealed the presence of blood. Nieves took swabs from various areas of the vehicle, and the clothing and swabs were sent to a laboratory run by the division of scientific services of the Department of Emergency Services and Public Protection (laboratory) to be analyzed for DNA. Buccal swabs from the defendant, Torello, and Corradino also were sent to the laboratory.

Michael Bourke, a DNA analyst with the laboratory, performed an analysis of and made comparisons between the DNA profiles generated from the buccal swabs and the DNA profiles derived from the clothing

and car swabs and prepared a report of his findings. With respect to the clothing, the defendant was included as a contributor to the DNA profile generated from the interior of the shirt collar and the stain on the jeans, and Torello and Corradino were eliminated as contributors to both profiles. With respect to the stain on the shirt, Corradino was included as a contributor, Torello was eliminated as a contributor, and the comparison with the defendant was inconclusive.

Both Corradino and the defendant were included as contributors to the genetic profiles generated from swabs taken from the gear shift and driver's side headrests of the Corvette, and Torello was eliminated as a contributor to both. Corradino was included as a contributor to the genetic profile generated from a swab taken from the passenger side armrest, while both Torello and the defendant were eliminated.

About two weeks after the fight, Corradino showed Torello a photograph of the defendant, and Torello identified the defendant[13] as one of the men who had been involved in the fight.[14] In discussions with the police, Torello shared this information. The defendant was arrested and charged by way of an amended long form information dated July 27, 2018. The first count alleged assault in the first degree of Torello in violation of General Statutes §§ 53a-8 and 53a-59 (a) (1). The second count alleged assault in the second degree of Corradino in violation of §§ 53a-8 and 53a-60 (a) (2), and the third count alleged conspiracy to commit assault in the first degree in violation of §§ 53a-48 (a) and 53a-59 (a) (1).

A trial was held in July and August, 2018. The state presented the testimony of Torello, Officer Browne, Lieutenant Anderson, Henninger, Detective Nieves, Adrienne Socci,[15] and Bourke. The defendant presented the testimony of Serrano. Neither Corradino nor Burgos testified at trial. The state issued a subpoena to Burgos, and, although he appeared on the date requested, he failed to return the next day as instructed. The court issued a capias for Burgos' arrest. When he had not been located the following day, the state rested its case-in-chief. That same day, the court put on the record the state's intention to proceed under a theory of *Pinkerton*[16] liability, rather than pursuing a theory of accessorial liability, as to counts one and two. After the parties informed the court that they had no further evidence, the trial court denied the defendant's motion for a judgment of acquittal.

The jury found the defendant not guilty of the assault of Torello, count one, but found the defendant guilty of counts two and three. Thereafter, the court sentenced the defendant to eight years of incarceration, execution suspended after five years, followed by three years of probation, on each count, to run concurrently. This appeal followed.

Before turning to the defendant's claims on appeal, we set forth the well established principles that guide our review. "[A] defendant who asserts an insufficiency of the evidence claim bears an arduous burden. . . . [F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried . . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical." (Citations omitted; internal quotation marks omitted.) *State* v. *VanDeusen*, 160 Conn. App. 815, 822–23, 126 A.3d 604, cert. denied, 320 Conn. 903, 127 A.3d 187 (2015).

"When we infer, we derive a conclusion from proven facts because such considerations as experience, or history, or science have demonstrated that there is a likely correlation between those facts and the conclusion. If that correlation is sufficiently compelling, the inference is reasonable. But if the correlation between the facts and the conclusion is slight, or if a different conclusion is more closely correlated with the facts than the chosen conclusion, the inference is less reason-

able. At some point, the link between the facts and the conclusion becomes so tenuous that we call it speculation. When that point is reached is, frankly, a matter of judgment." (Internal quotation marks omitted.) *State* v. *Rhodes*, 335 Conn. 226, 238,      A.3d      (2020).

"Finally, on appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *VanDeusen*, supra, 160 Conn. App. 823.

I

The defendant's first claim on appeal is that there was insufficient evidence to support his conviction of conspiracy to commit assault in the first degree. We agree with the defendant.

Pursuant to § 53a-48 (a), "[a] person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy." "Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Internal quotation marks omitted.) *State* v. *Allan*, 311 Conn. 1, 12, 83 A.3d 326 (2014). Pursuant to § 53a-59 (a) (1): "A person is guilty of assault in the first degree when . . . With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

"To obtain a conviction for conspiracy to commit assault in the first degree in violation of §§ 53a-48 (a) and 53a-59 (a) (1), as charged, the state bore the burden of proving beyond a reasonable doubt that the defendant (1) intended that conduct constituting the crime of assault in the first degree be performed, (2) agreed with one or more persons to engage in or cause the performance of such conduct and (3) that any one of those persons committed an overt act in pursuance of such conspiracy." *State* v. *Wells*, 100 Conn. App. 337, 347, 917 A.2d 1008, cert. denied, 282 Conn. 919, 925 A.2d 1102 (2007). "[W]hile the state must prove an agreement [to commit assault with a dangerous weapon], the existence of a formal agreement between the conspirators need not be proved because [i]t is only in rare instances that conspiracy may be established by proof of an express agreement to unite to accomplish an

unlawful purpose. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts. . . . Further, [c]onspiracy can seldom be proved by direct evidence. It may be inferred from the activities of the accused persons. . . . A conspiracy can be formed [however] in a very short time period . . . ." (Citation omitted; internal quotation marks omitted.) *State* v. *Millan*, 290 Conn. 816, 826, 966 A.2d 699 (2009).

On appeal, the defendant argues that "there is no evidence, nor any reasonable inference that can be drawn, that the defendant knew the unidentified person wielding a bat, much less that he entered into an agreement with that person to cause serious physical injury to another person." He further maintains that "the evidence, viewed in the light most favorable to the state, suggests that the defendant may have exchanged punches with Corradino, and Corradino's blood was on the defendant's clothing and in his vehicle. A spontaneous response to violence coupled with mere presence does not support a conspiracy conviction."

The state responds by highlighting the "evidence leading up to the actual altercation." As argued by the state, the jury could have credited Serrano's testimony that the defendant heard Torello say "something racist against [Hispanic] people." The state continues: "As a Hispanic man himself, it could be inferred that this made the defendant angry. In addition, a rational trier of fact could have credited those portions of Torello's testimony that placed Burgos and the defendant together, along with a group of other, older, Hispanic looking men."[17] The state recounts the evidence that, just prior to the fight, an individual from the group of Hispanic men told Torello that he could not smoke in front of the bar, and that Torello responded by asking if anyone was "planning to do anything?" As argued by the state, the defendant and his "compatriots" then attacked Torello and Corradino. The state further responds that, "given the fact that this group of men was at a bar, it is reasonable to infer that they did not carry the bat into the bar with them and, therefore, the defendant's cohort had retrieved the weapon in anticipation of starting a fight with Torello, in retaliation for Torello's previous racist comment." The state contends that "based on the concerted, simultaneous attack of Corradino and Torello by the defendant and his cohorts, it was reasonable to infer that the defendant and his companions had planned out the attack in advance."

The state's version of events, however, relies on a chain of inferences too tenuous to be reasonably drawn. There was no evidence presented or any reasonable inference that could be drawn that there existed a rela-

tionship between the defendant and the unidentified individual with the bat. Thus, the jury would have been required to resort to speculation to infer (1) that the unidentified individual with the bat was the defendant's "compatriot" or "cohort," and (2) that the attack was "concerted." The only evidence in the record with respect to the bat is found in the testimony of Torello and Serrano. Torello testified that while he was exchanging blows with the unidentified man who had walked up to him, another individual coming "somewhere from [his] left" hit him in the head with the bat.

We cannot find support for the state's representation in its appellate brief, without record citation, that "the defendant's own witness, Serrano, *testified that the defendant saw the bat* prior to the actual assault." (Emphasis added.) Because Serrano's testimony is the only evidence from which the jury could have inferred that the defendant saw the bat, we review it in some detail. In addition to Serrano's testimony regarding the racist comment and the individual who he thought had made such comment come outside the bar, Serrano testified to the following regarding the bat: "[A]ll I remember is three guys coming from this side, basically one guy with the bat—with a bat started and [the defendant] came and said, Whoa, Whoa, Whoa, Whoa"; that the defendant was standing "right next to" Serrano; and that the defendant "tried to like break it up and say, whoa, whoa." On cross-examination, Serrano further testified: "Me and [the defendant] was talking, and then we just seen one gentleman come out, come outside, went this way—went this way. That's when three gentleman came with a bat. They came with a bat and started hitting that—the gentleman that went that way . . . . And [the defendant] said, whoa, whoa, whoa, whoa." Serrano testified that the three men with the bat were "[b]asically like walking real fast," and that "it happened so fast" that he did not know what the men looked like. He further testified that the defendant did not walk to the three guys with the bat, but stood where he was and said, "Whoa, whoa, whoa, whoa."

On redirect, the following colloquy occurred between defense counsel and Serrano:

"Q. [H]ow long did this entire event take place when you were outside with [the defendant] and you saw this altercation with the bats? It was pretty fast; right?

"A. Yes.

"Q. Okay. And how far was [the defendant] from the person who was being assaulted, when you testified he had his hands up saying, no, no, no?

"A. Basically like where you at.

"Q. The distance from me to you?

"A. Um-hm.

"Q. Okay. And that was [the defendant's] distance

from the person with the bat; correct?

"A. Actually, he was like—he had his hands up and the guy with the bat was like over here.

"Q. Behind him?

"A. Yeah.[18]

"Q. And so—

"A. And that's when I went—that's when I went inside the bar.

"Q. Okay. And when you had testified—When [the prosecutor] was asking you about witnessing the event that evening with [the defendant] between the person being struck, how far away was he from the person being struck? [The defendant]?

"A. Like he would—Like—

"Q. It happened pretty quick; right?

"A. It was—It was like that.

"Q. Okay. Very quick; correct?

"A. Um-hm.

"Q. Okay. Thank you." (Footnote added.)

We note that Serrano's account of the evening was both internally inconsistent and conflicted with other evidence in the case. He first testified that he did not speak to the defendant on the evening of the fight but later testified that he both spoke with and played pool with the defendant. He testified that, after the defendant said, "Whoa, whoa, whoa, whoa," the defendant went "right back in the bar" but later testified that the defendant remained outside when he went back into the bar.

Lastly, and most importantly, although Serrano testified that "the three gentlemen came with a bat and started hitting that—the gentleman that went that way," he later acknowledged that he did not see anyone get hit with a bat.

The following exchange occurred between the prosecutor and Serrano:

"Q. And so these three guys, one of them had a bat; right?

"A. Um-hm.

"Q. And were they saying something, are they excited about something?

"A. They just came, they was like—and the accident like happened so fast, that I looked, and I was like, Oh, and then I went inside.

"Q. Yeah. Right. You didn't want to be around for that; right?

"A. No.

"Q. No. And so these three guys with the bat, they

started hitting this other guy; right?

"A. I guess.

"Q. So you don't even know?

"A. (Laughs.)

"Q. You didn't see the guy?

"A. Yeah.

"Q. All right. You have to just say no if you don't mind.

"A. Yeah.

"Q. All right. Thank you. And so you see three guys with a bat and you go I don't want any part of this, you go back inside; right?

"A. Yes."

We recognize that a jury may "credit part of a witness' testimony and . . . reject other parts." (Internal quotation marks omitted.) *State* v. *Rhodes*, supra, 335 Conn. 249–50. Serrano's testimony places the defendant in close proximity to the individual with the bat and suggests that the defendant tried to break up the fight by saying, "Whoa, whoa, whoa, whoa," but Serrano never specifically testified that the defendant saw the bat. Even if the jury reasonably could infer that the defendant saw the bat, on the basis of Serrano's testimony, any further inference that the defendant had entered into an agreement with that unidentified individual impermissibly would be based on "possibilities, surmise or conjecture." (Internal quotation marks omitted.) *State* v. *Green*, 261 Conn. 653, 668, 804 A.2d 810 (2002).

The defendant relies on two cases from our appellate courts in support of his contention that the cumulative force of the evidence is insufficient to establish his guilt. In *Green*, our Supreme Court affirmed the judgment of the Appellate Court setting aside the defendant's conviction of conspiracy to commit murder on the ground of insufficient evidence. Id., 655–57. In *Green*, several members of a gang, carrying handguns, went to a housing complex to settle a dispute with the defendant. Id., 658. The gang members approached the housing complex and found the defendant standing and talking with three people, one of whom, Duane Clark, saw the gang members approaching and exclaimed, "Shoot the motherfucker." Id. A gunfight ensued, during which one of the gang members, Tyrese Jenkins, was fatally wounded. Id. A witness to the gunfight testified that he saw the defendant shoot Jenkins. Id. The defendant and Clark were tried together, and the jury found Clark guilty of criminal possession of a pistol or revolver but not guilty of murder and conspiracy to commit murder. Id., 659. The jury found the defendant guilty of murder as an accessory, conspiracy to commit murder, and criminal possession of a pistol or revolver. Id., 655. On appeal, the defendant claimed, inter alia, that there was insufficient evidence to support his conviction of con-

spiracy to commit murder. This court agreed; see *State* v. *Green*, 62 Conn. App. 217, 224, 774 A.2d 157 (2001); as did our Supreme Court. See *State* v. *Green*, supra, 261 Conn. 673.

Our Supreme Court first recognized that the jury "could not have found that the defendant conspired with Clark to commit murder because Clark was acquitted of conspiracy to commit murder by the same jury that convicted the defendant of that offense."[19] Id., 670. The court then reviewed the evidence to determine whether the jury reasonably could have found that the defendant conspired with the other two people with whom he was standing and talking, Bobby Cook and Ryan Baldwin. Id., 671. The court found the record devoid of any evidence of a "prearranged plan to kill Jenkins," noting that there was no evidence to establish that Cook or Baldwin knew about any dispute between Jenkins' gang and the defendant. Id. The court further determined that the evidence was insufficient to establish that the defendant and Cook or Baldwin had agreed to kill Jenkins upon Jenkins' arrival to the housing complex. Id. The court explained that the evidence at trial had established only "that the defendant, Cook and Baldwin simultaneously reached for their guns, apparently in response to Clark's statement, 'shoot the motherfucker,' when Jenkins and his cohorts approached while wielding their guns." Id. Recognizing that "[a] conspiracy can be formed in a very short time period," the court stated that the evidence arguably could support a finding that the defendant had agreed with Clark to shoot Jenkins, but, because the jury found Clark not guilty of the charge of conspiracy to commit murder, that finding compelled the conclusion that the jury had rejected the state's claim that the defendant had conspired with Clark to kill Jenkins. Id.

In *Green*, the state argued that the defendant and his companions were members of a gang and, thus, the jury reasonably could have inferred that Cook and Baldwin, as members of the same gang as the defendant, knew of the dispute between the defendant's alleged gang and Jenkins' gang, and that Cook, Baldwin, and the defendant had agreed to kill Jenkins and his fellow gang members. Id., 672. The court rejected that argument, stating that the only evidence as to the relationship among Cook, Baldwin, and the defendant suggested that they "were friends who associated with each other" in the housing complex. Id. The court summarized the evidence in support of an inference that the defendant conspired with Cook or Baldwin as follows: "(1) the defendant, Cook and Baldwin were friends; (2) the defendant may have had a dispute with certain members of [Jenkins'] gang, including Jenkins; and (3) the defendant, Cook and Baldwin simultaneously drew their guns and started shooting as Jenkins and his fellow gang members approached, apparently in response to Clark's instruction to 'shoot the motherfucker.' " Id.,

672–73. The court found this evidence to constitute "too weak a foundation upon which to base an inference of an agreement, however swiftly formed, to kill Jenkins." Id., 673.

The defendant also relies on *State* v. *Smith*, 36 Conn. App. 483, 651 A.2d 744 (1994), cert. denied, 233 Conn. 910, 659 A.2d 184 (1995), in which this court reversed the defendant's conviction of conspiracy to commit assault in the first degree. Id., 484. In *Smith*, the victim, Walter Traynham, and his two friends confronted Harold Smith regarding a motor vehicle accident and shooting that occurred two weeks earlier. Id. Harold Smith also had two friends with him at the time of the confrontation, and the confrontation escalated and one of Traynham's friends punched Harold Smith in the face. Id. Harold Smith went into a nearby store and returned with the defendant. Id., 484–85. After Traynham's group left and walked up the street, the Smith group, which included the defendant, followed them into a convenience store. Id., 485. There was neither a discussion among the members of the Smith group nor any visible weapons while they were walking. Id. When the defendant entered the store, he and Traynham began fighting. Id. A member of the Smith group shouted, "Shoot him, shoot him," pulled a gun, and began shooting at two members of Traynham's group. (Internal quotation marks omitted.) Id. At this point, the defendant drew a revolver and shot Traynham. Id. Noting that the defendant was not present at the initial altercation and the lack of any evidence suggesting that the defendant knew that any other person in the Smith group had a gun and intended to use it to cause serious physical injury to Traynham, this court found the evidence insufficient to support an inference that the defendant entered into an agreement with anyone to commit the crime of assault in the first degree. Id., 487.

As in *Smith* and *Green*, the facts in the present case are wholly insufficient to support an inference that the defendant entered into an agreement with the unidentified individual with the bat to commit the crime of assault in the first degree. We note that the facts in *Smith*, in which the defendant not only knew his alleged coconspirators but also walked with them down the road to follow the victim into a store, and those in *Green*, in which the defendant's alleged coconspirators were friends of his, are even stronger than the facts of the present case, in which no relationship between the defendant and the unidentified bat wielding person was evinced.

The state argues that the evidence supported a conclusion that the defendant "knew of the bat's existence during the course of the assault and continued to participate." Citing *State* v. *VanDeusen*, supra, 160 Conn. App. 826–27, the state argues that the jury reasonably could have inferred that, having seen the bat "in his cohort's

possession," the defendant must have realized that he intended to use it against the victims. As argued by the state, the defendant's "subsequent participation in the group assault fully supported an inference that he had the requisite intent to agree with at least one other person to bring about all the elements of assault in the first degree." We disagree.

In *VanDeusen*, the defendant led her acquaintance, Charles Knowles, who was armed with a handgun, to the victim's house to fight the victim. *State* v. *VanDeusen*, supra, 160 Conn. App. 819–20. The defendant saw that Knowles was armed. Id., 820. Upon arriving at the victim's house, the defendant called the victim and asked her to come outside. Id. When the victim refused to come outside, Knowles fired his handgun at the house. Id. One of the bullets pierced the front door window and lodged in an interior wall. Id. The defendant was convicted of conspiracy to commit assault in the first degree, attempt to commit assault in the first degree as an accessory, and risk of injury to a child. Id., 817. The defendant appealed to this court claiming, inter alia, that there was insufficient evidence to support her conviction. Id., 823–24. With respect to her claim that there was insufficient evidence to prove that she had the requisite intent that she or another participant caused serious physical injury to another person, this court referenced testimony that the defendant admitted that she had seen the gun behind Knowles' belt buckle and, further, that she had seen him transfer it to his lap *on the way* to the victim's house. Id., 826. Despite knowledge that he was armed with the gun, the defendant led Knowles to the house and then called the victim "in an attempt to lure her" outside. (Internal quotation marks omitted.) Id., 827. The defendant later fled the scene with Knowles, helped him dispose of the gun, and lied to the police about her involvement. Id., 827–28. On the basis of this evidence, this court determined that the jury could have reasonably inferred that the defendant possessed the requisite intent. Id., 828.

In contrast with *VanDeusen*, in which the defendant knew that her acquaintance was armed with a handgun and continued to lead him to the victim's house, there was no evidence in the present case of any relationship between the defendant and the unidentified individual with the bat. In the present case, accepting the state's position that the jury reasonably could infer that the defendant saw the unidentified individual with the bat, and nonetheless continued to exchange punches with Corradino, would not support a further inference that the defendant had the requisite intent to agree with at least one other person to bring about all of the elements of assault in the first degree. That is, the lack of any evidence of a relationship between the defendant and the unidentified individual is fatal to the state's argument.

Moreover, the brief nature of the incident further supports our conclusion that, even were the jury to infer that the defendant saw the unidentified individual with the bat, the defendant's continued exchange of punches with Corradino for a short period of time does not support the inference of an agreement. First, we note that, according to Torello's testimony, he already was exchanging punches with an unidentified man when the individual approached and hit him with the bat. Moreover, Serrano was not even able to describe the men with the bat because "it happened so fast." Lastly, through the bar window, Henninger saw people running outside and "a lot of chaos." Although a conspiracy can be formed in a very short time period; see *State* v. *Millan*, supra, 290 Conn. 826; the brief nature of the incident in the present case when considered together with the lack of any evidence of a prior relationship between the defendant and the unidentified individual with the bat, renders the link between the continued participation in the fight following perception of the bat and the inference of agreement too tenuous.

We are mindful that "the requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." *State* v. *Crosswell*, 223 Conn. 243, 256, 612 A.2d 1174 (1992). Our appellate courts have upheld convictions for conspiracy when the state presented evidence that the coconspirators acted in concert. See id. (defendant stood by silently when gun was displayed in order to gain entry and then used to intimidate occupants of premises is evidence from which jury might reasonably have inferred defendant's acquiescence in this enlarged criminal enterprise); *State* v. *Faust*, 161 Conn. App. 149, 168 and n.4, 127 A.3d 1028 (2015) (evidence sufficient to infer agreement to commit robbery when two men acted in concert and engaged in coordinated robbery, whereby first man had gun and stayed with victims, while second man moved throughout other rooms in store and demanded to know where cashbox was located), cert. denied, 320 Conn. 914, 131 A.3d 252 (2016); *State* v. *VanDeusen*, supra, 160 Conn. App. 826–27 (with knowledge that coconspirator had weapon "at the ready," defendant continued guiding coconspirator to victim's house and called victim in attempt to lure her outside); *State* v. *Elsey*, 81 Conn. App. 738, 747, 841 A.2d 714 (jury could have based at least part of its decision regarding conspiracy charges on defendant's decision to come to scene of crime with coconspirators, stay at scene while crimes were committed and leave scene with coconspirators), cert. denied, 269 Conn. 901, 852 A.2d 733 (2004).[20]

In the present case, we conclude that the jury could not reasonably infer the requisite agreement from the

proof of the separate acts of the defendant and the unidentified individual with the bat or from the circumstances surrounding the commission of these acts. Here, there was no evidence presented that the defendant and the unidentified individual with the bat engaged in any coordinated action or had any relationship whatsoever. Even in the light most favorable to the state, the cumulative weight of the evidence suggested only that, while the defendant exchanged punches with Corradino, an unidentified individual beat Torello with a bat, not that the two did so pursuant to a mutual plan. Accordingly, the jury would have been required to resort to speculation to infer the existence of an agreement.

On the basis of the foregoing, we conclude that the evidence adduced at trial was insufficient to support the defendant's conviction of conspiracy to commit assault in the first degree.

## II

The defendant's second claim on appeal is that there is insufficient evidence to sustain his conviction for assault in the second degree. He argues, inter alia, that even "assuming arguendo that an agreement with a still as yet unidentified third party can be shown, the state presented no evidence that said individual caused physical injury to Corradino with a dangerous instrument."[21] The state agrees with the defendant and acknowledges that the defendant's conviction of assault in the second degree should be reversed. We agree with the parties.

The defendant was charged in count two with assault in the second degree as to Corradino, which required proof beyond a reasonable doubt that Corradino's injuries were caused by a dangerous instrument. See General Statutes § 53a-60 (a) (2) ("[a] person is guilty of assault in the second degree when . . . with intent to cause physical injury to another person, the actor causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument other than by means of the discharge of a firearm"). As the state acknowledges, no such evidence was presented. Corradino did not testify at trial. Torello testified that the defendant squared up with Corradino, and the two exchanged punches. He further testified that Corradino had fallen on top of him at some point. Officer Browne testified that upon his arrival at the scene, he encountered Corradino, who was bleeding from his head. Officer Browne testified that Corradino told him that he was "hit in the head," and a photograph was entered into evidence depicting Corradino's head injury. Officer Browne additionally testified that both Torello and Corradino were transported to the hospital. On this record, we agree with the parties that insufficient evidence was presented to establish that Corradino's injuries were caused "by means of a dangerous instrument" and, therefore, the defendant's conviction of assault in

the second degree under § 53a-60 (a) (2) should be reversed.[22]

The judgment is reversed and the case is remanded with direction to render judgment of acquittal.

In this opinion the other judges concurred.

[1] The defendant also was charged with one count of assault in the first degree in violation of § 53a-59 (a) (1). The jury found him not guilty of that charge.

[2] The defendant also raises on appeal a claim of instructional error. Specifically, he claims that the court, in charging the jury, "improperly omitted the scienter requirement that the defendant intended that a dangerous instrument be used to carry out the assault" and maintains that the omission "diluted the state's burden of proof [and] deprived the defendant of due process and his right to trial by jury." We do not reach the defendant's claim of instructional error because we conclude that the evidence was insufficient to support the defendant's conviction and we reverse the judgment of conviction on that basis.

[3] Burgos' last name is spelled both "Bergos" and "Burgos" throughout the transcripts. Throughout this opinion, we refer to him as Burgos.

[4] Torello had a pistol in the car but he never retrieved it.

[5] Surveillance video from a nearby business showed a Corvette leaving the plaza where the bar is located. The video was transferred to a thumb drive, but it was lost.

[6] Henninger's testimony conflicts with Torello's testimony that he believed he saw Burgos leave with the defendant.

[7] The recording of the 911 call reporting the fight no longer existed at the time of trial.

[8] Officer Browne was not close enough to identify the two vehicles leaving the property.

[9] Officer Browne did not take any photographs of the scene.

[10] Tests conducted at the hospital revealed the presence of cocaine, benzodiazepine, and alcohol in Torello's system. Xanax is a common prescription form of a benzodiazepine.

[11] Officer Browne had received information that the license plate of the Corvette had two "B's" in the plate number. Officers were then able to determine the full plate number. The vehicle was registered to the defendant's mother.

[12] The Walgreens receipt was timestamped about six hours before the fight. The police seized surveillance footage from Walgreens, which footage showed the Corvette and a man wearing a white polo shirt with a diagonal stripe.

[13] The police did not take any written statements from Torello or Corradino during their investigation.

[14] Torello subsequently filed a civil action against the defendant, seeking money damages.

[15] Socci is an orthopedic surgeon, who performed surgeries on Torello's ankle following the fight.

[16] "In *Pinkerton* v. *United States*, [328 U.S. 640, 647–48, 66 S. Ct. 1180, 90 L. Ed. 1489 (1946)], the United States Supreme Court concluded that under the federal common law, a conspirator may be held liable for criminal offenses committed by a coconspirator if those offenses are within the scope of the conspiracy, are in furtherance of it, and are reasonably foreseeable as a necessary or natural consequence of the conspiracy. . . . We note that our Supreme Court first recognized the *Pinkerton* theory of liability as a matter of state law in *State* v. *Walton*, 227 Conn. 32, 40–54, 630 A.2d 990 (1993)." (Citation omitted; internal quotation marks omitted.) *State* v. *Van-Deusen*, 160 Conn. App. 815, 843 n.16, 126 A.3d 604, cert. denied, 320 Conn. 903, 127 A.3d 187 (2015).

[17] Serrano testified that both he and the defendant are Hispanic.

[18] In its appellate brief, the state represents the distance between the defendant and the three men with the bat to be approximately ten feet. In support of this distance, the state represents that "Serrano referred to the distance between the defendant and the man with the bat by referencing the distance between the witness box and defense counsel." It further notes that the prosecutor in closing argument "referred to this testimony, without objection, as placing the defendant 'about ten or twelve feet away' when he tried to break up the fight."

[19] We disagree with the state's contention that the unique circumstances

of *Green* renders it wholly inapplicable. Although our Supreme Court concluded that the jury necessarily must have rejected the state's claim that the defendant had conspired with Clark to kill the victim, our Supreme Court thereafter analyzed, in the light most favorable to sustaining the verdict, whether sufficient evidence existed to establish that the defendant had conspired with the other two people with whom he was standing and talking. *State* v. *Green*, supra, 261 Conn. 671.

[20] The state also points to the defendant's "flight from the scene with one of his compatriots, both of whom tracked Corradino's blood into the defendant's Corvette," as supportive of the conclusion that they had conspired to commit assault in the first degree. Although the jury was permitted to consider whether the defendant's flight from the bar reflected consciousness of guilt, the evidence regarding the defendant's leaving the bar, even when considered together with the other evidence presented during trial, was too weak a foundation to permit an inference of an agreement. There was no evidence presented that the passenger in the defendant's car was the unidentified individual with the bat. Cf. *State* v. *Young*, 157 Conn. App. 544, 553, 117 A.3d 944 (sufficient evidence to establish conspiracy when defendant and coconspirator arrived at scene of shooting together, fired weapons simultaneously in same direction, fled scene together, disposed of weapons beneath porch of nearby building, and attempted to hide in school), cert. denied, 317 Conn. 922, 118 A.3d 549 (2015). Moreover, Torello testified that he thought he saw Burgos leave with the defendant. However, Torello was "unsure" whether Burgos had been involved in the fight or even whether he was with the group of Hispanic men outside the bar just before the fight started.

[21] The defendant also argues that because there was insufficient evidence to support his conviction of conspiracy to commit assault in the first degree, the defendant's conviction of assault in the second degree cannot be sustained as a matter of law. Noting that the state charged him with assault in the second degree pursuant to a theory of conspiratorial liability under the *Pinkerton* doctrine, the defendant maintains that the jury first would have had to convict him of the underlying charged conspiracy. See footnote 16 of this opinion. We need not address this argument because we agree with the parties that insufficient evidence was presented to establish that Corradino's injuries were caused "by means of a dangerous instrument," and we reverse his conviction of assault in the second degree on that basis.

[22] The state argues that the proper remedy should be a remand with direction to modify the defendant's conviction to reflect the lesser included offense of assault in the third degree in violation of General Statutes § 53a-61 (a) (1). The state acknowledges, however, that this court's remand order is controlled by our Supreme Court's decisions in *State* v. *Petion*, 332 Conn. 472, 499–507, 211 A.3d 991 (2019), and *State* v. *LaFleur*, 307 Conn. 115, 140–42, 51 A.3d 1048 (2012), pursuant to which the state is not entitled to a modification of the judgment to reflect a conviction of the highest lesser included offense supported by the evidence when, as here, the jury was not instructed on such lesser included offense. The state raises the argument that "*LaFleur*, and by extension *Petion*, were wrongly decided for preservation purposes." To the extent that the state urges this court, in some form, to question the correctness of those rulings, we observe, as the state recognizes, that as an intermediate court of appeals, we are unable to overrule, reevaluate or reexamine controlling precedent of our Supreme Court. See *State* v. *Johnson*, 143 Conn. App. 617, 628, 70 A.3d 168, cert. denied, 310 Conn. 950, 82 A.3d 625 (2013).

––––––––––––––––––