******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* DANIELLE P.* (AC 47104)

Seeley, Westbrook and Palmer, Js.

*Syllabus*

Convicted, after a jury trial, of harassment in the second degree and criminal violation of a protective order, the defendant appealed. She claimed, inter alia, that the evidence was insufficient to support her convictions because the state failed to establish that the victim, V, had received harassing and alarming phone calls, texts and mailings, and that she was responsible for any such harassing communications. *Held*:

This court concluded that, although the defendant was prosecuted under the wrong revision of the statute **(§ 53a-183 (a))** proscribing harassment in the second degree, that impropriety was harmless beyond a reasonable doubt.

The revision of the statute **((Rev. to 2021) § 53a-183 (a), as amended by Public Acts 2021, No. 21-56, § 5)** under which the defendant was prosecuted imposed a more onerous evidentiary burden on the state, in that it required proof that the defendant's conduct had caused terror or intimidation, whereas the applicable revision of the statute **((Rev. to 2019) § 53a-183 (a))** required communication with the intent to harass, annoy or alarm, and, as the trial court's jury instruction under the incorrect revision of the statute was considerably more favorable to the defendant than the correct jury instruction would have been, and because the defendant had full and fair notice of the nature of the charges and her allegedly unlawful conduct, this court was satisfied that the erroneous jury instruction did not prejudice the defendant.

The defendant's claim that the evidence was insufficient to support her conviction of harassment in the second degree was without merit, as it was reasonable and logical for the jury to find, given the sheer volume of her unwelcome and incessant contacts, in which she threatened to "ruin" V's life and make it "a living hell," that she repeatedly had contacted V for the purpose of harassing and causing him alarm and that she made those contacts in a manner likely to cause him such alarm.

The evidence was sufficient to support the defendant's conviction of violating the criminal protective order the trial court had issued against the defendant, as certain defects in the order did not render it invalid in light of the defendant's having engaged in conduct prohibited by the order before

---

*In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to use the defendant's full name or to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2024); we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

seeking to have it declared invalid, and the defendant provided no support for her claims to the contrary.

The defendant was not entitled to review of her unpreserved claims that the trial court and the prosecutor engaged in various improprieties and misconduct during the trial, as those claims were set forth in conclusory terms, unaccompanied by analysis, legal authority or reference to facts in the record that identified any actions, statements or other conduct that provided a basis for her assertions.

Argued March 10, 2025—officially released March 17, 2026

*Procedural History*

Substitute information, in the first case, charging the defendant with two counts of the crime of harassment in the second degree, and information, in the second case, charging the defendant with the crime of criminal violation of a protective order, brought to the Superior Court in the judicial district of New Haven, geographical area number seven, where the cases were consolidated and tried to the jury before *Chaplin*, *J.*; verdicts and judgments of guilty, from which the defendant appealed to this court. *Affirmed*.

*Danielle P.*, self-represented, the appellant (defendant).

*Danielle Koch*, assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, *Brian K. Sibley, Sr.*, senior assistant state's attorney, and *Leah Schwartz*, certified legal intern, for the appellee (state).

*Opinion*

PALMER, J. The self-represented defendant, Danielle P., appeals from the judgments of conviction, rendered after a jury trial, of two counts of harassment in the second degree in violation of General Statutes § 53a-183 (a)[1] and one count of criminal violation of a protective

---

[1] As we explain more fully hereinafter, the defendant was improperly charged and tried under General Statutes (Rev. to 2021) § 53a-183 (a), as amended by Public Acts 2021, No. 21-56, § 5, rather than the version of the statute in effect at the time the defendant engaged in her unlawful conduct, namely, General Statutes (Rev. to 2019) § 53a-183 (a). For the

order in violation of General Statutes § 53a-223 (a). On appeal, the defendant claims that **(1)** there was insufficient evidence to support her convictions, and **(2)** her constitutional and civil rights were violated as a result of certain judicial and prosecutorial improprieties. We conclude that the evidence was sufficient to support the defendant's convictions and that her other claims are inadequately briefed, unpreserved and otherwise unsupported by the record. Accordingly, we affirm the judgments of the trial court.

The jury reasonably could have found the following facts. In 2017, the defendant and V became involved romantically and moved in together. Not long thereafter, however, they ended their romantic relationship and began dating other people while continuing to reside together platonically. Sometime later, V observed that the defendant appeared to be jealous of the woman he was dating and, as a result, in 2019, he and the defendant separated. In 2020, however, when V needed a place to stay while he was looking for an apartment, the defendant allowed him to reside with her. Upon remembering "how [the defendant] was," V decided he did not want to remain with the defendant, and he moved out after he was able to find a residence of his own.

After V moved into his own apartment, the defendant called him, wanting to be friends, but V declined. The defendant told V that if they could not be friends, she would make his life "a living hell . . . ." The next morning, V discovered that all four of the tires on his car had been slashed. The defendant began calling V repeatedly, and when V answered one of the calls, the defendant admitted to sending someone to vandalize his tires.

V contacted the police numerous times about the defendant's harassing conduct. On one such occasion, on January 6, 2021, V reached Officer Marviline Carter of the North Haven Police Department and informed Carter about the ongoing issues he was having with the

reasons set forth in part I of this opinion, however, we conclude that this impropriety was harmless beyond a reasonable doubt.

defendant. V explained that the defendant had been calling and texting him incessantly from several different phone numbers. V also told Carter that the defendant had mailed him an envelope containing her electronic benefits transfer (EBT) card and PIN number. In addition, V played for Carter a recording of the defendant in which she acknowledged that she had his tires vandalized and had been calling him repeatedly. Using phone numbers that V identified from his cell phone as belonging to the defendant, Carter called the defendant and instructed her to cease any further contact with V. Although the defendant told Carter that she understood, the defendant soon resumed contacting V. Upon learning this information, Carter obtained an arrest warrant charging the defendant with harassment in the second degree, and the defendant was arrested pursuant to the warrant.

On March 19, 2021, the court issued a full no contact protective order prohibiting the defendant from having any contact with V or with others whom the contact would likely cause annoyance or alarm to V. Following the issuance of the protective order,[2] the defendant continued to call V on multiple occasions, and the defendant also repeatedly called V's girlfriend, M, as well as M's son. After speaking with V and learning that the defendant had been calling him constantly, Sergeant Santiago Mateo of the North Haven Police Department obtained an arrest warrant charging the defendant with violation of the protective order. Subsequently, the defendant was charged in an amended long form information with two counts of harassment in the second degree in one case[3]

[2] The trial court issued the protective order on the record and in the defendant's presence during her arraignment on the harassment charges and provided the defendant with a copy of the order at that time. The court also read the order to the defendant and explained that a violation of its terms constitutes a felony. The court asked the defendant if she understood the terms of the order, and she responded in the affirmative.

[3] The first count alleged that between November 14, 2020, and January 6, 2021, the defendant intentionally harassed V by repeatedly telephoning him despite being advised that V did not want any contact with the defendant. The second count alleged that between those same dates, the defendant intentionally harassed V by repeatedly texting him and

and with one count of violation of a criminal protective order in another case. The state filed a motion to consolidate the two cases for purposes of trial, and the court granted the motion.

Following a trial,[4] the jury found the defendant guilty as charged. The court rendered judgments in accordance with the jury verdicts and imposed a total effective sentence of eighteen months of incarceration, execution suspended, followed by eighteen months of conditional discharge. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

Before considering the defendant's claims of evidentiary insufficiency and judicial and prosecutorial impropriety, we address an issue that neither party raised in the trial court or on appeal, namely, whether the defendant was properly charged and tried under the version of § 53a-183 (a) that was in effect when the defendant engaged in harassing conduct toward V. Although we conclude that the defendant was prosecuted under the wrong version of § 53a-183 (a), we also conclude that the impropriety did not prejudice the defendant.

As alleged in the amended long form information, the conduct of the defendant that provided the basis for the two counts of harassment in the second degree occurred between November 14, 2020, and January 6, 2021. See footnote 3 of this opinion. Both of those counts used language identical to the wording of the 2021 revision of § 53a-183 (a), as amended by Public Acts 2021, No. 21-56, § 5 (P.A. 21-56);[5] the current version of that statutory

communicating with him by mail after being advised that V did not want any contact with the defendant.

[4] The defendant represented herself at trial as well as on appeal.

[5] General Statutes (Rev. to 2021) § 53a-183 (a), as amended by P.A. No. 21-56, § 5, provides in relevant part: "A person is guilty of harassment in the second degree when *with intent to harass, terrorize or alarm* another person, and *for no legitimate purpose*, such person . . . (2) makes a telephone call or engages in any other form of communication, whether or not a conversation ensues, *in a manner likely to cause terror, intimidation or alarm* . . . ." (Emphasis added.)

provision, which did not become effective until October 1, 2021,[6] well after the defendant was alleged to have engaged in her harassing conduct toward V. Consistent with the language of the information, the trial court, without objection, instructed the jury under General Statutes (Rev. to 2021) § 53a-183 (a), as amended by P.A. No. 21-56, § 5, rather than under General Statutes (Rev. to 2019) § 53a-183 (a),[7] the version of the statute in effect when the defendant engaged in the harassing conduct alleged in the amended long form information. Although the parties never raised the issue, in the interest of justice, we afforded them the opportunity to submit supplemental briefs to address, first, the propriety of the trial court's jury instructions on harassment in the second degree, and second, the appropriate remedy, if any, in the event the instruction was improper. See, e.*g.*, *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 161–62, 84 A.3d 840 (2014) (reviewing court was not precluded from raising issues involving constitutional error sua sponte, as long as record is adequate for review of unpreserved claim and court provides parties opportunity to be heard by way of supplemental briefs); see also *State* v. *Adam P.*, 351 Conn. 213, 231, 330 A.3d 73 (2025) ("[i]nstruc-

---

[6] The first count of the amended long form information alleged in relevant part that the defendant intentionally harassed V, "and *for no legitimate purpose*, [the defendant], made telephone calls, *in a manner likely to cause terror, intimidation, or alarm* . . . ." (Emphasis added.)

The second count of the amended long form information alleged in relevant part that the defendant intentionally harassed V "*for no legitimate purpose* [and] *in a manner likely to cause terror, intimidation, or alarm* . . . repeatedly texted and communicated by mail with [V] . . . ." (Emphasis added.) Both counts charged a violation of § 53a-183 (a) (2). See footnote 3 of this opinion.

[7] General Statutes (Rev. to 2019) § 53a-183 (a) provides in relevant part: "A person is guilty of harassment in the second degree when . . . (2) *with intent to harass, annoy or alarm* another person, he communicates with a person by telegraph or mail, by electronically transmitting a facsimile through connection with a telephone network, by computer network, as defined in section 53a-250, or by any other form of written communication, *in a manner likely to cause annoyance or harm*; or (3) *with intent to harass, annoy or alarm* another person, he makes a telephone call, whether or not a conversation ensues, *in a manner likely to cause annoyance or alarm*." (Emphasis added.)

tional errors violate due process—and, therefore, are of constitutional dimension—when they confuse . . . one of the essential elements of the crime"). The state filed a supplemental brief on the issue; the defendant did not. Although the instruction was improper because it tracked the language of the wrong version of the statute,[8] we agree with the state that the error was harmless beyond a reasonable doubt.[9]

The version of the statute in effect at the time of the defendant's conduct; see General Statutes (Rev. to 2019)

[8] In its supplemental brief, the state asserts that, at the time of her arrest, the defendant was charged with harassment in the second degree under the correct version of the statute, General Statutes (Rev. to 2019) § 53a-183 (a), because the 2021 revision of the statute, as amended by P.A. 21-56, § 5, had not yet taken effect. Although the arrest warrant itself does not distinguish between the two versions of the statute, we have no reason to dispute the state's representation. The state also maintains, however, that "[t]he state's [amended] long form information, filed July 11, 2023, and the rest of the court record, do not indicate any departure from [the] 2019 edition of the statutes," asserting, further, that the defendant was "properly prosecuted . . . even assuming for the sake of argument that the defendant was charged in the state's [amended] long form information with the incorrect version of the harassment statute . . . ."

Although we ultimately agree with the state that the defendant cannot prevail on appeal, we have difficulty understanding the state's assertion that the record reflects no departure from the correct version of the statute. For example, the information charges the defendant in the precise language of the 2021 statutory revision, as amended by P.A. 21-56, § 5, asserting in each of the two counts of harassment in the second degree that the defendant, "for no legitimate purpose," engaged in the prohibited conduct "in a manner likely to cause terror, intimidation, or alarm . . . ." See footnote 6 of this opinion. Moreover, the trial court instructed the jury in the precise language of the 2021 revision of § 53a-183, as amended by P.A. 21-56, § 5. Further, in its original brief to this court, the state cited to and relied on the 2021 revision of § 53a-183, as amended by P.A. 21-56, § 5, clearly treating it as the operative statutory provision for purposes of the case. Consequently, contrary to the state's contention, it is clear that the defendant was not prosecuted under General Statutes (Rev. to 2019) § 53a-183 (a), as she should have been but, rather, under the 2021 revision of the statute, as amended by P.A. 21-56, § 5, which was not yet in effect when the defendant engaged in the harassing conduct at issue here.

[9] In light of our determination that the improper jury instruction was harmless, we need not address other arguments raised by the state to

§ 53a-183 (a); provided in relevant part that a person is guilty of harassment in the second degree when, "with intent to harass, annoy or alarm another person," she communicates with a person "in a manner likely to cause annoyance or alarm," either by mail or text; see General Statutes (Rev. to 2019) § 53a-183 (a) (2); or by making a telephone call, whether or not a conversation ensues. See General Statutes (Rev. to 2019) § 53a-183 (a) (3). By contrast, General Statutes (Rev. to 2021), as amended by P.A. 21-56, § 5, pursuant to which the court instructed the jury, provides that a person is guilty of harassment in the second degree when, "with intent to harass, terrorize or alarm another person, and for no legitimate purpose," she makes a telephone call or engages in any other form of communication "in a manner likely to cause terror, intimidation or alarm . . . ." General Statutes (Rev. to 2021) § 53a-183 (a) (2), as amended by P.A. 21-56, § 5.

There is some overlap in the language of the two versions of the statute: under both, a defendant is prohibited from communicating with the intent to harass or to alarm another person and doing so in such a manner likely to cause "alarm . . . ." However, whereas the 2019 revision of the statute, which is applicable to the present case, requires that the communication be made with the intent to "harass, annoy or alarm" and in a manner likely to cause "annoyance or alarm," the 2021 statutory revision, as amended by P.A. 21-56, § 5, requires that the communication be made with the intent to "harass, terrorize or alarm . . . and for no legitimate purpose," and in a manner likely to cause "terror, intimidation or alarm . . . ."

On the basis of this language, it is clear that the trial court's erroneous jury instruction imposed a more onerous or demanding evidentiary burden on the state than was required under the correct version of the statute because harassing conduct aimed at causing "terror" or "intimidation" is qualitatively more serious and extreme

support its contention that the defendant's conviction of harassment in the second degree should stand despite the erroneous instruction.

than conduct intended to cause "annoyance" or "alarm."[10] For this reason, any harassing conduct falling within the terms of the predecessor version of the statute necessarily would fall within the terms of the 2021 revision, as amended. Because the instruction as given was considerably more favorable to the defendant than the correct instruction would have been, and because the defendant otherwise had full and fair notice both of the nature of the charges and the unlawful conduct in which she allegedly engaged, we are satisfied beyond a reasonable doubt that the trial court's erroneous instruction did not prejudice the defendant.[11] See, e.g., *State* v. *Johnson*, 345 Conn. 174, 196, 283 A.3d 477 (2022) ("the test for determining whether a constitutional [error] is harmless . . . is whether it appears beyond a reasonable doubt that the [error] complained of did not contribute to the verdict obtained" (internal quotation marks omitted)). Accordingly, the defendant is not entitled to any relief due to the erroneous instruction.

Finally, the state's improper reliance on the 2021 revision of § 53a-183, as amended by P.A. 21-56, § 5, gives rise to a second, albeit related, issue pertaining to the defendant's conviction of making harassing telephone

---

[10] We note that, in his March 10, 2021 testimony before the Judiciary Committee regarding the proposed 2021 amendment to § 53a-183 (a), Chief State's Attorney Richard J. Colangelo, Jr., expressly acknowledged this enhanced burden on the state, explaining that "terrorizing is going to be harder to reach [than annoyance]." Conn. Joint Standing Committee Hearings, Judiciary, Pt. 4, 2021 Sess., p. 2719.

[11] The court's jury instruction on the wrong version of the statute did not constitute structural error and, therefore, is subject to a harmlessness analysis. "Structural [error] cases defy analysis by harmless error standards because the entire conduct of the trial, from beginning to end, is obviously affected . . . . These cases contain a defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." (Internal quotation marks omitted.) *State* v. *Alexander*, 343 Conn. 495, 511 n.13, 275 A.3d 199 (2022). Thus, "[o]nly a small share of constitutional errors are structural, that is, so presumptively harmful that they require automatic reversal. . . . Most, rather, are subject to harmless error review. . . . This includes errors in instructing the jury as to the elements of a crime." (Citations omitted.) *Banks* v. *Commissioner of Correction*, 339 Conn. 1, 29, 259 A.3d 1082 (2021).

calls as charged in count one of the amended long form information. The defendant was charged with violating subsection (a) (2) of § 53a-183 in each of the two counts alleging harassment in the second degree; see footnote 6 of this opinion; and she was found guilty of both counts as charged. However, although harassing telephone calls are prohibited under subsection (a) (2) of the 2021 revision of § 53a-183, as amended by P.A. 21-56, § 5, under the correct version of the statute, General Statutes (Rev. to 2019) § 53a-183 (a), such telephone calls are barred under subsection *(a) (3)*. Consequently, with respect to the first count alleging harassing telephone calls, the defendant was convicted under the wrong statutory subsection. However, for the same reasons that we have determined that the defendant was not prejudiced by virtue of having been charged and tried under the wrong version of the statute—including the fact that she had due notice of the charges and the state's case against her—we conclude that the defendant's conviction of placing harassing telephone calls under the incorrect statutory subsection does not constitute reversible error. We reach this determination because, in the particular circumstances of the present case, this error is properly viewed as technical, rather than fundamental or substantive, in nature. Cf. *State* v. *Hilton*, 45 Conn. App. 207, 208 n.2, 694 A.2d 830 (although information charged defendant with capital felony in violation of General Statutes (Rev. to 1989) § 53a-54b, defendant was convicted under § 53a-54b, and state's brief cited § 53a-54b, because case was otherwise tried and presented to jury under murder statute, General Statutes § 53a-54a, on appeal, defendant's conviction under § 53a-54b instead of under § 53a-54a was treated as scrivener's error), cert. denied, 243 Conn. 925, 701 A.2d 659 (1997), cert. denied, 522 U.S. 1134, 118 S. Ct. 1091, 140 L. Ed. 2d 147 (1998). In view of the fact that the fairness of the defendant's trial was not implicated by her conviction

under the wrong subsection of § 53a-183 (a), that impropriety does not require a new trial. We therefore turn to the defendant's claims on appeal.

## II

The defendant first contends that there was insufficient evidence to support the jury's guilty findings on all three counts. We disagree.

We begin our analysis with the familiar principles that govern our consideration of a claim of evidentiary insufficiency. "In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"In particular, before this court may overturn a jury verdict for insufficient evidence, it must conclude that no reasonable jury could arrive at the conclusion the jury did. . . . Although the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense . . . each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . .

"If it is reasonable and logical for the [jury] to conclude that a basic fact or an inferred fact is true, the [jury] is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt." (Citations omitted; internal quotation marks omitted.) *State* v. *Waters*, 214 Conn. App. 294, 301–302, 280 A.3d 601, cert. denied, 345 Conn. 914, 284 A.3d 25 (2022).

In addition, "[t]he law is clear that it is within the jury's exclusive province to determine what weight, if

any, to afford evidence and to determine the credibility of witnesses. . . . [W]e must defer to the jury's assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude. . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict." (Citation omitted; internal quotation marks omitted.) *State* v. *Makins*, 232 Conn. App. 199, 220, 335 A.3d 67, cert. denied, 353 Conn. 908, 344 A.3d 150 (2025).

Furthermore, "[i]n evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . . Finally, on appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Citations omitted; internal quotation marks omitted.) *State* v. *Luciano*, 204 Conn. App. 388, 397–98, 253 A.3d 1005, cert. denied, 337 Conn. 903, 252 A.3d 362 (2021).

A

The defendant first claims that the evidence was insufficient to support the jury's guilty findings with respect to the two counts of harassment in the second degree. In support of her contention, the defendant argues that the state's evidence failed to establish that V had received harassing and alarming phone calls, texts and mailings, and that, in any event, the evidence was insufficient to prove that she was the individual responsible for any such harassing communications.[12] We reject the defendant's claim.

V testified at trial that, after he moved into his apartment and declined the defendant's invitation to remain

---

[12] On appeal, the defendant's argument with respect to her evidentiary insufficiency claim does not distinguish between the two counts of

friends, the defendant called him and said that she was "going to ruin my life, make my life a living hell if we can't be friends. If I can't come over and we can't—I can't come over and have dinner with you or whatever, whatever, we going to be enemies." V further testified that after he discovered that all four tires on his car had been slashed, the defendant called him "multiple times, about a million times. Kept calling, calling. I couldn't— I couldn't even turn my phone off. She was calling and calling. So, I finally answered the phone, and I wanted to know what happened to my tires. She told me she popped my tires. I don't know if she—she actually said—she was going back and forth. She actually said she probably sent somebody over to pop my tires or whatever." V also explained that he had repeatedly complained to the police about the defendant's numerous harassing and threatening phone calls and texts because the defendant continued to contact him on multiple occasions.[13] The arrest warrant application for the defendant, which outlined V's multiple complaints to the police about her repeated phone calls and texts to him from various numbers, and a police report dated January 6, 2021, explaining the defendant's history of harassing V by phone and mail,

harassment in the second degree. Consequently, we, too, address both counts together.

[13] We note that, on cross-examination, V testified that the defendant had threatened him over the phone and not by way of texts. V further stated that he did not recall receiving any harassing texts and was concerned about the defendant "calling [him] over and over and over and over again," on some occasions, "all through the night." With respect to V's testimony about the texts, "[i]t is well-settled . . . that [e]vidence is not insufficient . . . because it is conflicting or inconsistent. . . . Rather, the [finder of fact] [weighs] the conflicting evidence and . . . can decide what—all, none, or some—of a witness' testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Williams*, 200 Conn. App. 427, 449, 238 A.3d 797, cert. denied, 335 Conn. 974, 240 A.3d 676 (2020); see also *Parker* v. *Slosberg*, 73 Conn. App. 254, 265, 808 A.2d 351 (2002) ("jury [is] free to credit one version of events over the other, even from the same witnesses"). Accordingly, the jury reasonably could have credited the substance of the complaints that V made about harassing texts "closer in time to the events at issue, when [his] recollection would have been fresher." *State* v. *Stephen J. R.*, 309 Conn. 586, 600, 72 A.3d 379 (2013).

both of which were introduced into evidence, buttressed V's testimony.[14]

Carter testified that while meeting with V following one of his numerous complaints to the police about the defendant's constant and unwanted phone calls and texts, V showed Carter the call log on his cell phone. The log contained two different phone numbers from which he had been called repeatedly, and V identified the calls from those numbers as coming from the defendant. Carter then called one of the numbers and was sent to voicemail, and the outgoing voicemail message indicated that it was the defendant's phone number. Carter dialed the second number in V's call log from which he also had received numerous calls, and the person who answered identified herself as the defendant. Carter informed the defendant of V's complaint and told the defendant to cease all contact with V. The defendant responded that she did not realize that V had an issue with her, that she had sent her EBT card to V because he needed money for groceries, and that she would not have any contact with him in the future. However, V subsequently reported that the defendant continued to contact him and, on one occasion, graphically threatening to cause him harm if he did not use the EBT card. The defendant also left multiple messages from various phone numbers admitting to showing up unannounced at his home and at the homes of V's former girlfriends. In addition, according to V, soon after Carter informed the defendant to cease contact with him, the defendant "was getting apps to call me on that wasn't really nobody's number. It was—she was changing numbers, calling from different numbers all the time."

In view of the evidence adduced at trial, it was reasonable and logical for the jury to conclude that the defendant had repeatedly called V and texted and mailed him for the purpose of harassing him and causing him alarm. Moreover, given the sheer volume of the defendant's

---

[14] The defendant herself introduced those two documents into evidence during her cross-examination of V.

unwelcome contacts with V, her unwillingness to cease communication with V, and the content of at least some of those communications—for example, the defendant threatened to "ruin [V's] life" by making it a "living hell"—it was reasonable for the jury to find that the incessant calls, texts and mailings from the defendant were done with the intent to harass or to alarm V and were done in a manner likely to cause alarm to V.

With respect to the defendant's contention that the evidence was insufficient to establish that the defendant was responsible for the harassing communications, the jury was entitled to find that V, who had known the defendant for at least several years and had lived with and been romantically involved with her, was sufficiently familiar with the defendant to recognize both her voice over the phone and her phone numbers. The jury also was free to credit V's testimony, substantiated by his call logs and consistent complaints to the police, that the defendant had initiated the unceasing calls, texts and mailings. As stated previously, it is the jury's unique role to evaluate and ascertain the veracity of witnesses and to decide whether to accept or reject, in whole or in part, a witness' testimony. Consequently, "[q]uestions of whether to believe or disbelieve a competent witness are beyond our review"; (internal quotation marks omitted) *State* v. *Margaraci*, 198 Conn. App. 305, 315, 232 A.3d 1220 (2020), cert. denied, 345 Conn. 916, 284 A.3d 299 (2022); and we therefore will not second-guess the jury's credibility determinations with respect to V or Carter. See, e.g., *Downing* v. *Dragone*, 216 Conn. App. 306, 333, 285 A.3d 59 (2022) ("[b]ecause it is the sole province of the trier of fact to assess the credibility of witnesses, it is not our role to second-guess such credibility determinations" (internal quotation marks omitted)), cert. denied, 346 Conn. 903, 287 A.3d 601 (2023).

The defendant also asserts that the state's case was insufficient because the state failed to adduce certain evidence at trial, such as the actual call logs on V's phone and a letter that the defendant had sent to V along with

her EBT card. The defendant cross-examined the state's witnesses, V and Carter, on these matters, and, during closing argument, she urged the jury to conclude that the state had failed to prove its case beyond a reasonable doubt because of the evidence that was not introduced. It was for the jury to decide whether the absence of that or any other evidence had a bearing on the strength of the state's case and, ultimately, to determine, in light of all the evidence, whether the state proved beyond a reasonable doubt that the defendant was guilty under the two counts of harassment in the second degree with which she was charged. Moreover, when considering the defendant's claim of evidentiary insufficiency, we are bound to review that claim based only on the evidence presented at trial; see, e.g., *State* v. *Luciano*, supra, 204 Conn. App. 396 (insufficiency of evidence claim is tested by reviewing no less than, and no more than, evidence introduced at trial); and that evidence was sufficient to support the jury's findings with respect to the two counts of harassment in the second degree. Accordingly, the defendant's claim that the evidence was insufficient as to those two counts is without merit.

B

The defendant further maintains that the state failed to prove that she violated the protective order. The defendant also appears to contend that the protective order was invalid and, therefore, unenforceable. We reject the defendant's contentions.

Due to the defendant's harassing conduct, as discussed previously, the trial court issued a full no contact protective order on March 19, 2021, when the defendant was arraigned on the harassment charges. In relevant part, the protective order prohibited the defendant from "contact[ing] [V] in any manner, including by written, electronic or telephone contact, [and from] contact[ing] [V's] home, workplace or others with whom the contact would be likely to cause annoyance or alarm to [V]." Under § 53a-223 (a), "[a] person is guilty of criminal violation of a protective order when an order [of protection] issued

pursuant to subsection (e) of section 46b-38c . . . has been issued against such person, and such person violates such order." "It is well settled that in order to prove a charge of criminal violation of a protective order, the state must demonstrate that a protective order was issued against the defendant . . . and it must demonstrate the terms of the order and the manner in which it was violated by the defendant." (Internal quotation marks omitted.) *State* v. *Wiggins*, 159 Conn. App. 598, 604, 124 A.3d 902 (2015), cert. denied, 327 Conn. 908, 170 A.3d 4 (2017).

The defendant asserts, in largely conclusory terms, that the state relied only on allegations and produced no persuasive evidence at trial that she violated the protective order. Instead of addressing the evidence, however, the defendant focuses primarily on the fact that V's date of birth and race were listed incorrectly on the protective order. It is not entirely clear, though, why, in the defendant's view, these errors are material to her case because she does not appear to dispute either the existence of the protective order or that it prohibited her from contacting V or others with whom such contact would likely cause annoyance or alarm to V.[15] In any event, we treat her claim with respect to the protective order as twofold: first, that the protective order was invalid because of those errors, and second, that the evidence was insufficient to prove a violation of § 53a-223 (a).

The defendant cannot prevail on her claim challenging the validity of the protective order because, as this court previously has explained, "the validity of the [protective] order is not an element of the crime of criminal violation of a protective order under § 53a-223. . . . In *State* v. *Wright*, 273 Conn. [418, 870 A.2d 1039 (2005)], our Supreme Court held that the invalidity of the protective order does not constitute a legitimate defense to the charged crime. Id., 424. The *Wright* court began its

---

[15] See footnote 2 of this opinion. Moreover, at the hearing at which the protective order was issued, the court expressly asked the defendant if she knew the identity of the "protected person" with "[t]he [initial V]," and the defendant said that she did.

analysis by reiterating its holding in *Cologne* v. *West-farms Associates*, 197 Conn. [141, 147–48, 496 A.2d 476 (1985)], that in the context of a contempt proceeding, an order issued by a court of competent jurisdiction must be obeyed by the parties until it is reversed by orderly and proper proceedings. . . . In extending the application of this rule from a contempt proceeding to a protective order, the court concluded: If the defendant believed that the [protective] order did not comport with the statutory requirements of [General Statutes] § 46b-38c (e), he had two lawful remedies available to him. He could have: (1) sought to have the order modified or vacated by a judge of the Superior Court pursuant to Practice Book § 38-13; or (2) appealed the terms of the order to the Appellate Court in accordance with General Statutes § 54-63g. Having failed to pursue either remedy, the defendant may not seek to avoid his conviction for violating that order by challenging the factual basis of its issuance. *State* v. *Wright*, supra, 426–27 . . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Winter,* 117 Conn. App. 493, 502, 979 A.2d 608 (2009), cert. denied, 295 Conn. 922, 991 A.2d 569 (2010). In light of the foregoing, the defendant cannot challenge the validity of the protective order because she engaged in conduct prohibited by the order before seeking to have it declared invalid.[16]

We also conclude that there was sufficient evidence from which the jury reasonably could have found that the

---

[16] Significantly, however, the defendant, without objection, elicited testimony from V that his date of birth and race were listed inaccurately in the protective order, and the defendant questioned him extensively about those inaccuracies. It also bears noting that, during its deliberations, the jury sent a note to the court, asking, "does the fact that the person listed as the protected party is different, based on the incorrect date of birth, invalidate a protective order? Meaning, even if the defendant contacted [V], sitting in the courtroom testifying, she, technically, did not contact an individual named on the protective order, as the protected person?"

In response to the question, the court instructed the jury as follows. "First, a protective order is issued, primarily, to give notice to a defendant that they are to not engage in certain conduct with regard to another person. Secondarily, it is to give that second person notice that they are

protective order issued against the defendant on March 19, 2021, and that she violated the order by placing multiple phone calls to V and to M and her son, as well, after that date. Jennifer Rollberg, deputy chief clerk of the Superior Court, geographical area number seven, in Meriden, testified that, on March 19, 2021, a protective order was issued against the defendant listing V as the protected party. The protective order was admitted as a full exhibit at trial and, as previously noted, prohibited the defendant from having any contact with V or any other person with whom such contact would likely cause annoyance or alarm to V.

V testified that, following the issuance of the protective order, the defendant continued to call him multiple times and that she "started calling [M] and threatening [M and her son] because [the defendant] was mad at them for some reason. And that's when I had to call the police again. And that's when I did have the protective order. I showed the police the protective order that night." V further testified that he called the police regarding the violations of the protective order sometime in October, 2021, but that he could not remember the exact date.

Mateo testified that, in the late evening of October 10, 2021, or the early morning hours of October 11, 2021, he responded to a complaint from V that he had received repeated calls from the defendant. V showed Mateo the call logs on his phone, which revealed many calls from private numbers and from a number that the caller ID identified as belonging to the defendant. The state introduced as a full exhibit a paper copy of the screenshot that Mateo took of the call log on V's phone.[17] Mateo also

protected from the first person. As to whether the date of birth, which you heard significant testimony about, today, is a material difference, or merely a scrivener's error, that is something for you to consider. But to understand that the intention behind the protective order is to give one person notice that they are not to do XY and Z, to the second person. And it's for protection." The court's instruction in response to the jury's inquiry has not been challenged in the defendant's appeal.

[17] There were no dates on the call log identifying the phone as belonging to V, and the defendant cross-examined Mateo on this point.

interviewed M, who reported multiple harassing phone calls similar to those received by V.

M also testified at trial and confirmed that she had been receiving numerous unwanted and harassing calls, some from numbers that she knew were associated with the defendant and others from numbers that she did not recognize. However, given the nature of those calls and their similarity to calls that V had been receiving from the defendant—the caller did not speak but instead left messages requesting a return call—it was apparent that the calls were coming from the defendant.

The foregoing evidence fully supports the jury's finding that the defendant violated the protective order as charged, and the defendant has provided no support, factual or otherwise, for her contrary contention. Consequently, we reject the defendant's claim of evidentiary insufficiency with respect to her conviction of criminal violation of a protective order.

III

The defendant also raises several claims concerning alleged improprieties and misconduct by the trial court and the prosecutor. The defendant cannot prevail on her claims because they are either not properly preserved, adequately briefed or supported by the record.

The defendant asserts that the trial court "committed perjury all during the trial" and otherwise engaged in "egregious" misconduct, "did not allow [her] to have a pretrial [conference] to determine if [there] was enough evidence to go to trial," and "denied [her] the opportunity to submit supporting evidence [of] her innocence," including "evidence from the [state] Commission [on] Human Rights [and] Opportunities . . . ." The defendant also asserts that the prosecutor had an "[a]ctual conflict of interest," improperly failed to provide her with a witness list until shortly before trial commenced, withheld evidence, including a police report from the North Haven Police Department, did not provide her with certain "video and audio recordings" pertaining to

her case, denied her the "opportunity to speak with any witnesses," and presented "misleading information" and "falsif[ied]" documents.

The defendant's claims, all of which are set forth in wholly conclusory terms, are unaccompanied by any analysis, legal authority or reference to facts in the record. In addition, the defendant did not properly preserve her claims by raising them at trial or otherwise providing the trial court or this court with a factual or legal basis for the claims. Furthermore, we have identified nothing in the record that supports the defendant's claims. Indeed, with respect to her allegations of intentional misconduct by both the trial court and the prosecutor, the defendant has not identified any actions, statements or other conduct, either by the court or the prosecutor, that provide any basis for her bald assertions of such misconduct.

"We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [When] a claim is asserted in the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned. . . . For a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . . In addition, briefing is inadequate when it is not only short, but confusing, repetitive, and disorganized." (Internal quotation marks omitted.) *State* v. *Godbout*, 229 Conn. App. 231, 235–36, 326 A.3d 1142 (2024).

Furthermore, it is a "fundamental precept, deeply ingrained in our decisional law and our rules of practice, that the appellate courts of this state shall not be bound to consider a claim unless it was distinctly raised at the trial. . . . Requiring a party to distinctly raise a claim of error before the trial court is no mere formality; rather, it ensures that the trial court is specifically apprised of

the alleged error and, thus, has an opportunity to respond accordingly. As [our Supreme Court] repeatedly has observed, the essence of the preservation requirement is that fair notice be given to the trial court of the party's view of the governing law . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Ramon A. G.*, 190 Conn. App. 483, 492–93, 211 A.3d 82 (2019), aff'd, 336 Conn. 386, 246 A.3d 481 (2020). Relatedly, "[a]s an appellant, the self-represented defendant bore the burden of providing this court with an adequate record. . . . In the absence of an adequate record, we can engage only in speculation and conjecture, which have no place in appellate review." (Citations omitted; footnote omitted.) *State* v. *Raffone*, 163 Conn. App. 410, 414–15, 136 A.3d 647 (2016).

Of course, "[w]e are mindful that [i]t is the established policy of the Connecticut courts to be solicitous of [self-represented] litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the [self-represented] party." (Internal quotation marks omitted.) *State* v. *Godbout*, supra, 229 Conn. App. 236. "The courts adhere to this rule to ensure that [self-represented] litigants receive a full and fair opportunity to be heard, regardless of their lack of a legal education and experience . . . ." (Internal quotation marks omitted.) *Traylor* v. *State*, 332 Conn. 789, 806, 213 A.3d 467 (2019). Thus, we "always [have] been solicitous of the rights of [self-represented] litigants and, like the trial court, will endeavor to see that such a litigant shall have the opportunity to have [her] case fully and fairly heard so far as such latitude is consistent with the just rights of any adverse party." (Internal quotation marks omitted.) *Costello* v. *Goldstein & Peck, P.C.*, 321 Conn. 244, 257, 137 A.3d 748 (2016). "Nonetheless, [a]lthough we allow [self-represented] litigants some latitude, the right of self-representation provides no attendant license not to comply with relevant rules

of procedural and substantive law." (Internal quotation marks omitted.) *State* v. *Godbout*, supra, 236.

Despite our long-standing "policy to give leeway to [self-represented] litigants regarding their adherence to the rules of this court"; (internal quotation marks omitted) *State* v. *Bethea*, 187 Conn. App. 263, 267 n.3, 202 A.3d 429, cert. denied, 332 Conn. 904, 208 A.3d 1239 (2019); because the defendant's claims are unpreserved, unsupported by the record and devoid of any analysis or authority, the defendant is not entitled to review of her claims.[18] Accordingly, we reject those claims.

The judgments are affirmed.

In this opinion the other judges concurred.

---

[18] Even if we were to review the defendant's claims, they lack merit. The record contains no suggestion that either the trial court or the prosecutor engaged in any misconduct of any kind. The defendant never requested a pretrial ruling or hearing in accordance with Practice Book § 41-8 to determine whether the information should be dismissed for lack of evidence. The record also provides no support for the defendant's contention that she was barred from introducing evidence in her own defense, and she never sought to introduce the only evidence that she has identified in support of her claim, namely, "evidence from the . . . Commission [on] Human Rights [and] Opportunities . . . ." Indeed, the defendant has not explained the substance of this evidence or why it would be relevant to any issue in her trial. Contrary to her claim, the state provided the defendant with a witness list, and the defendant indicated that the list included all the witnesses who she herself might elect to call on her own behalf. The record also provides no support for the defendant's claim that she was barred from interviewing witnesses or that the state withheld from the defendant relevant evidence in its possession. Finally, the defendant has provided no explanation of the nature of the prosecutor's alleged conflict of interest, let alone has she offered proof of any such conflict. For those reasons, the defendant could not prevail on her claims even if they were reviewable.